FILED

2026 Apr-16  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **CHRISTINA CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **5:24-cv-452-EGL** |
| | ) | |
| **PATRICK BISHOP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Christina Carter sued Patrick Bishop, a Cullman County Deputy Sheriff, for excessive force and malicious prosecution (Doc. 1). Carter claims Bishop used excessive force when he pepper sprayed her and when he later broke her right arm while attempting to handcuff her. Carter also claims he committed malicious prosecution because he misrepresented facts in pursuing an arrest warrant. Asserting qualified immunity, Bishop moves for summary judgment. *See* Docs. 31, 32. The motion (Doc. 31) is **GRANTED**.

## BACKGROUND

Christina Carter is a Navy veteran with PTSD. Doc. 29-6 at 4. In April 2022, Carter visited her sister's house, *id.* at 9, and they got into a fight, Doc. 1 at ¶3. Carter decided she should go home but her sister and nephew's vehicles were blocking her truck from leaving. Doc. 29-6 at 10. Carter's sister would not move her vehicle and would not let her son move his vehicle. *Id.* Carter felt like her "life [wa]s in danger" and that she was being "held hostage." *Id.* At some point Carter stepped out of the vehicle to ask why her sister wouldn't move her car. *Id.* Carter says her sister pulled her hair which made her "very upset, very angry," and "afraid for [her] life." *Id.* at 11. For that reason, Carter says she picked up a "small little bat" before dropping it and "bulldoz[ing]" her sister out of her way. *Id.*

A neighbor witnessed the fight and called 911. Doc. 29-13 at 2-3. The neighbor told the operator: "she is beating the s*** out of her." Doc. 29-10 at 4. Deputy Sheriff Patrick Bishop was dispatched to the scene. The dispatchers explained to him that the aggressor "had a baseball bat at a victim," Doc. 29-3 at 20, and was trying to leave, *id.* at 25-26.

When Bishop arrived, "Carter was attempting to leave in her truck" by "backing out of the driveway" at a high speed. Doc. 1 at ¶¶5-6; Doc. 29-3 at 37. Bishop ordered her to stop but she didn't. Doc. 29-3 at 37. Carter continued to back down the driveway until Bishop hit the side of her vehicle with his hand. *Id.*

2

"Carter stopped, put her truck in park, got out of the truck, and yelled at the unknown person who had hit her truck." Doc. 1 at ¶7. Carter "notice[d] the blue lights," Doc. 29-6 at 12, and then "approached" Bishop, Doc. 35-1 at ¶4. She yelled something like "Sir, I just want you to know that I have severe service-connected PTSD!" *Id.* Bishop ordered her to "look into his camera" and say her name. *Id.* When Bishop said this, Carter was "so afraid for [her] life," Doc. 29-6 at 12, and she "screamed and backed away," Doc. 35-1 at ¶4. Bishop pepper sprayed Carter because, in his view, she posed a threat. Doc. 29-3 at 18. Carter sat down in the driveway. Doc. 29-6 at 18.

From here, much of the interaction is captured by body camera footage. Bishop spoke with the neighbor. Doc. 29-1 at 0:30-1:20. The neighbor explained what led her to call the police, making statements like, "She would've beat the s*** out of me," and "She took a baseball bat after her." *Id.* While Bishop talked to the neighbor, Carter sat on the ground yelling at Bishop shouting things like, "My dumb b**** sister was pulling my hair," and "I'm upset!" *Id.* Bishop returned briefly to his patrol car and then walked back up on the driveway. *Id.* at 1:20-1:50.

Carter then got up to retrieve her phone from her vehicle. She said, "I'm just getting my phone." "Leave me alone." *Id.* at 1:55-2:01. Bishop asked her to put her hands out in front of her. *Id.* at 2:10-2:14. Carter responded, "No, no you're not arresting me." *Id.* at 2:14-2:16. Bishop yelled again, "Put both your hands in front

3

of you." *Id.* at 2:16-2:18. Bishop attempted to grab Carter's hands, but she pulled them away and stepped back from Bishop. *Id.* at 2:18-2:23. She yelled, "Whoa I didn't do anything!" She then apparently dropped her glasses and then stepped toward Bishop and yelled, "Don't step on my f****** glasses!" *Id.* at 2:23-2:25. As she bent over to pick up her glasses, Bishop twice ordered her to go to her knees, but Carter said no and walked away, disregarding another order to go to her knees. *Id.* at 2:25-2:35. Bishop and two other officers then pressed her against a vehicle and began to struggle with her as they attempted to handcuff her. *Id.* at 2:35-2:47; Doc. 1 at ¶¶21-22. Two officers were on her left arm, and Bishop was on her right arm. Doc. 1 at ¶22; Doc. 29-3 at 14. As Carter resisted, she yelled things like "No. I didn't do anything!" "Don't you f****** do it!" and "you're gonna break my glasses, you idiot!" Doc. 29-1 at 2:35-2:47. Around five seconds after the last comment, she screamed and fell to the ground. *Id.* at 2:45-3:00. Carter's arm was broken. Doc. 32 at ¶37. After Carter fell to the ground, Bishop placed Carter's right arm in handcuffs. Doc. 29-1 at 2:55-3:15. Carter was later charged with Second Degree Assault for kicking Bishop while she resisted arrest. *See, e.g.*, Doc. 29-14 at 4.

Carter is not "100% sure exactly what [Bishop] did to break [her] arm." Doc. 29-8 at 4. But she believes that her arm broke because "Bishop forcefully struck" it. Doc. 35-1 at ¶7. In her deposition, Carter explained that she "heard something metal click and then … felt something hit [her] in the elbow … and that's when [her]

4

arm … shattered." Doc. 29-6 at 14. Neither of the body cam videos show Bishop striking Carter. Bishop explained that he was attempting to get Carter's hand behind her back when she "torqued up" and her arm broke. Doc. 29-3 at 16. Bishop denied using any type of judo method or any other technique. Doc. 29-3 at 16-17. But another officer on the scene described Bishop as using "some kind of f****** judo move," a type of arm bar. Doc. 29-4 at 11, 13; Doc. 32 at 9 n.5; *see also* Doc. 29-7 at ¶104 (expert report explaining that judo moves are not "contrary to generally accepted practice in law enforcement"). In other words, Bishop forcefully pulled Carter's arm behind her back. Doc. 29-4 at 12; Doc. 29-5 at 4-5.

Carter admits that she "resisted arrest as deputies attempted to handcuff" her. Doc. 29-9 at ¶15; *see also* Doc. 29-6 at 12-13 (admitting that she pulled her arms away "[a]t first" as officers tried to handcuff her). As she explained, "there was no way I could [comply], I just did not trust [Bishop]. Mentally, I was just done." Doc. 29-6 at 13; *see also* Doc. 29-13 at ¶11 (describing Carter as "aggressive[]" and "emotionally out of control" while officers attempted to cuff her). From the time officers first touched her to the time she went to the ground was around 25 seconds. *See* Doc. 29-2 at 0:38-1:12. Carter explained she did not "have any more contact with Bishop" after she was handcuffed. Doc. 29-6 at 15. But Carter claims that by the time Bishop broke her arm, she had "resigned to being cuffed … and was allowing Bishop to cuff" her. Doc. 35-1 at ¶7.

## STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "material" if it might affect the case's outcome. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The movant may discharge its burden by pointing out the absence of evidence supporting an essential element of the nonmovant's case. *Id.* at 325. The district court must draw all inferences and review the evidence in the light most favorable to the nonmovant. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant carries its initial burden, the nonmovant must come forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If a rational trier of fact could not find for the nonmovant, there is no genuine dispute for trial. *Id.* But all reasonable doubts are resolved in the nonmovant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## DISCUSSION

Carter sued Bishop under 42 U.S.C. § 1983 for allegedly violating her Fourth Amendment rights against excessive force and malicious prosecution. *See Barnes v. Felix*, 605 U.S. 73, 76 (2025); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024). In addition to showing Bishop violated her constitutional rights, Carter must overcome qualified immunity. *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

The Eleventh Circuit has identified three sources of clearly established law: "case law with indistinguishable facts"; "a broad statement of principle … that clearly establishes a constitutional right"; and "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc). No matter the source, the law must be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). Unless the official is "plainly incompetent" or "knowingly violate[d] the law," the suit will fail. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White*, 580 U.S. at 79).

The law must also "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63. That is because the "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). And because the Fourth Amendment's application varies widely from case-to-case, the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Wesby*, 583 U.S. at 64 (quoting *White*, 580 U.S. at 79). Otherwise, an officer might struggle "to determine how the relevant legal doctrine" applies. *Kisela*, 584 U.S. at 104.

## I.    Counts I & II: Excessive Force

An excessive force claim is analyzed under the Fourth Amendment. "The touchstone of the Fourth Amendment is reasonableness, as measured in objective terms." *Barnes*, 605 U.S. at 79 (internal quotation marks omitted) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). This analysis requires looking at the totality of the circumstances, *id.* at 80, and courts have explained that the use of force "'must be reasonably proportionate' to the need," measured by factors like "the severity of the crime, the danger to the officer, and the risk of flight." *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197-98 (11th Cir. 2002)); *see also Castro-Reyes v. City of Opa-Locka*, 166 F.4th 886, 900 (11th Cir. 2026) (listing additional factors).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations and internal quotation marks omitted). Rather than demanding perfection, the Fourth Amendment's reasonableness test accounts for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Because the analysis "depends very much on the facts of each case," *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13), it requires the Court to "'slosh [its] way through' a 'factbound morass,'" *Barnes*, 605 U.S. at 80 (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)), viewing the evidence "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396. As a result, "[t]here is no 'easy-to-apply legal test,'" *Barnes*, 605 U.S. at 80 (quoting *Scott*, 550 U.S. at 382-83), and a reasonable officer cannot know he violates the law "unless existing precedent 'squarely governs' the specific facts at issue," *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 584 U.S. at 104).

9

## A. Count I: Pepper Spray

Carter sues Bishop for using pepper spray on her. Doc. 1 at ¶¶31-33. "[T]he use of pepper spray is not excessive force in situations where the arrestee poses a threat to law enforcement officers or others, uses force against officers, physically resists arrest, or attempts to flee." *Brown v. City of Huntsville*, 608 F.3d 724, 739 (11th Cir. 2010); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is reasonable … where the plaintiff was either resisting arrest or refusing police requests."). Not only is pepper spray often lawful, but it is also "a very reasonable alternative to escalating a physical struggle with an arrestee," *Brown*, 608 F.3d at 739 (quoting *Vinyard*, 311 F.3d at 1348), as it "ordinarily causes only temporary discomfort," *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003).

Based on the undisputed facts, Bishop arrived at the scene under the impression that the alleged perpetrator acted violently and having reason to believe Carter was the perpetrator. Doc. 29-3 at 20, 25-26. Carter initially disregarded Bishop's order to stop her vehicle. *Id.* at 37. When she stepped out of the vehicle, she "yelled" at Bishop and "approached" him, only to disregard his order to say her name into the camera and back away in fear for her life. Doc. 1 at ¶7; Doc. 35-1 at ¶4. Bishop then pepper sprayed her, Doc. 29-3 at 18, which caused her to sit down.

10

During this time, Bishop spoke with a witness before returning to arrest Carter. Doc. 29-1 at 0:30-1:20.

Carter argues Bishop violated clearly established law when he pepper sprayed her because she was not a threat, a flight risk, or refusing to obey commands. Doc. 36 at 10-12. She mainly relies on two cases: *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011), and *Howell v. Sheriff of Palm Beach Cnty.*, 349 F. App'x 399 (11th Cir. 2009). *See* Doc. 36 at 10-12.

In *Fils*, the plaintiff stood outside a nightclub with a "calm" crowd after police made a couple arrests. 647 F.3d at 1288. With his back to the officers, the plaintiff made a derogatory remark about them, prompting an officer to approach the plaintiff with his taser out and ask the plaintiff what he said. *Id.* The plaintiff turned around, saw the taser, put his hands up, and took a single step back. *Id.* Without warning, the officer tazed him. *Id.* Had the plaintiff appeared "hostile, belligerent, and uncooperative," the force might have been justified. *Id.* at 1290 (quoting *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)). But the use of force violated clearly established law because the plaintiff committed a minor offense if any, did not resist arrest, did not pose a threat to anyone, and did not disobey any instructions. *Id.* at 1292; *see also id.* at 1288-90.

In *Howell*, the plaintiff (an off-duty Sheriff's Deputy) attended a birthday party for his neighbor's sixteen-year-old son. 349 F. App'x at 400. The police

responded to a noise complaint about the party around 11:00 p.m. *Id.* at 401. The plaintiff stood near the sound system, and an officer yelled at him to turn off the music. *Id.* The plaintiff responded "You don't have to talk to me like that. I'm a f****** deputy just like you." *Id.* The officer pepper sprayed him before he "completed the phrase 'just like you.'" *Id.* The plaintiff then went inside to wash his eyes. *Id.* The court concluded that the officer violated clearly established law because the offense—violating a noise ordinance—was minor, the plaintiff did not display aggression, and the officer letting the plaintiff go inside suggested he was not attempting to subdue the plaintiff or prevent him from resisting or fleeing. *Id.* at 405.

These cases do not clearly place Bishop's use of force outside the bounds of the Fourth Amendment. Those cases about use of force against non-violent suspects who merely mouthed off would not put Bishop on notice in this case that a court would "carefully balance" the crime's severity, the safety threat, and the risk of flight in Carter's favor. *Fils*, 647 F.3d at 1288. Bishop had reason to believe Carter committed a violent crime, and he witnessed her refuse multiple orders. Thus, a reasonable officer could believe Carter's situation posed a larger threat and required more force to gain compliance and ensure safety than in a case like *Fils*, where the plaintiff was tased for merely making a snarky comment.

## B. Count II: Broken Arm

Carter claims Bishop used excessive force when he broke her arm while attempting to handcuff and arrest her. Doc. 1 at ¶¶34-36. Because the "right to make an arrest … necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, the Fourth Amendment indisputably allowed Bishop to use some force. Like any arrest, "some use of force … [wa]s necessary and altogether lawful." *Huebner*, 935 F.3d at 1191 (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003)); *see also Horn v. Barron*, 720 F. App'x 557, 564 (11th Cir. 2018) (some force appropriate even when suspect is "totally compliant"). That is particularly true because—as Carter concedes—she resisted arrest. Doc. 36 at 16; Doc. 29-9 at ¶15.

Yet she contends Bishop violated a right the Eleventh Circuit clearly established in *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997). Though "the pivotal point for excessive force claims" is "often" when the "suspect is handcuffed and 'pose[s] no risk of danger to the officer,'" *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015), the court in *Smith* found the officer used excessive force and violated clearly established law before placing the suspect in cuffs, 127 F.3d at 1419. But just "barely." *Id.*

The plaintiff in *Smith*—suspected of committing a non-violent drug offense—initially resisted arrest by raising a baseball bat in a threatening manner and running

away, but when police later caught up with the plaintiff, he complied with an instruction to lay on the ground and "docilely submitted to arrest." *Id.* at 1418-19. Despite the plaintiff's submission, the officer was justified in using some force. *Id.* at 1419-20. But the officer got on his back, put his arm in a position prompting the plaintiff to complain, and then "with a grunt and a blow," broke the plaintiff's arm. *Id.* at 1417-20. The officer was not entitled to qualified immunity.

Reasoning from *Smith*, Carter agrees that Bishop would have been justified to use pepper spray, a taser, or some other force designed to gain control rather than seriously injure during her resistance. Doc. 36 at 16. She nonetheless claims that Bishop used excessive force because by the time he broke her arm she had relented and using enough force to break the bone of a suspect who is not resisting is clearly unconstitutional. *Id.* at 16-17, 20. But *Smith* was a "very close case" applying a "hazy" "case-by-case balancing test." 127 F.3d at 1419. Bishop could not "have 'read' [it] beforehand and 'know[n]' that it proscribed [his] specific conduct," *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)).

To start, Carter's argument that she was "no longer resisting arrest at the moment the force was used … misses an important point." *Teal v. Campbell*, 603 F. App'x 820, 822 (11th Cir. 2015). "In qualified immunity cases, we ask not whether the suspect intended to surrender or abandon his resistance," but "whether a

reasonable officer on the scene would have perceived that plaintiff was no longer resisting and no longer a threat." *Id.* "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *see also Mobley*, 783 F.3d at 1355-56.

Unlike the plaintiff in *Smith* who complied with commands to lay on the ground and docilely submit, Carter "does not point to any facts that would have made it objectively unreasonable for the officers to believe" she had not relented. *Mobley*, 783 F.3d at 1355. Carter twice ignored commands to stick out her hands so she could be cuffed, three times ignored commands to go to her knees, walked away from officers attempting to arrest her, made statements like "you're not arresting me" and "Don't you f****** do it" as officers attempted to cuff her, and forced officers into a prolonged physical struggle to arrest her. *See supra* at 3-5.

When Bishop "decided to use force," Carter "was not handcuffed and had not submitted clearly to [his] authority." *Prevatt v. City of Gainesville*, 657 F. App'x 905, 909 (11th Cir. 2016) (emphasis omitted). There is "no evidence" that she "signaled in any way to the officers that [s]he had surrendered and that [s]he was no longer resisting and no longer a threat." *Teal*, 603 F. App'x at 822. Instead, officers continued to struggle to handcuff her until after her arm broke. None of the witnesses testified that she clearly gave in, explaining instead that she resisted. *See* Doc. 29-

13 at ¶11; Doc. 29-4 at 10; Doc. 29-5 at 6. Whether or not that is so, the Court cannot "conclude that it would have been readily apparent to a reasonable officer that [Carter] had forsaken h[er] aggressive resistance." *Teal*, 603 F. App'x at 822.

The absence of clear indicia of submission places this case in sharp contrast to *Smith*. Taking Carter's testimony as true, Bishop could have reasonably failed to notice that Carter's resistance had waned, or he could have reasonably concluded that she was merely pausing her fight temporarily. From the moment officers arrived, she was combative and hostile. Even if she momentarily relented while officers continued to struggle cuffing her, Bishop could reasonably conclude that force was warranted to finally secure her.

On these facts, *Smith* does not clearly establish that Bishop used excessive force. Like the court in *Smith*, Carter relies on a broken arm to support the excessive force claim. Doc. 36 at 19-21. In excessive force cases, however, the question is whether the officer used force proportional to the need. *Huebner*, 935 F.3d at 1191. In some cases, the appropriate level of force may cause injury or even death. *McCroden v. Cnty. of Volusia*, 724 F. App'x 768, 771-72 (11th Cir. 2018). Thus, although the severity of the plaintiff's injury is certainly relevant, it is not dispositive. *See Mobley*, 783 F.3d at 1355.

In *Smith*, the officer broke the arm of a man who was peaceful, compliant, and under control. 127 F.3d at 1419-20. On those facts, though the officer might have

16

been "entitled to use some force," a broken bone strongly pointed to the conclusion that whatever force he permissibly could have used, he had crossed the line. *See id.* Here, on the other hand, Bishop could have reasonably believed he was entitled to use more force than in *Smith*, and because the force in *Smith* just "barely" crossed the "hazy" line, *id.* at 1419, Bishop could not have read that case and known that whatever force he used, it better not be enough to break a bone.

Nor has Carter put forward evidence suggesting a reasonable officer should have known that the force Bishop applied likely would cause a significant injury. The parties dispute the manner in which Bishop broke Carter's arm, but no matter what happened, Carter has not come forward with enough evidence for a jury to find Bishop clearly used excessive force because she has presented no evidence that any of the methods Bishop might have used are known to cause significant injury. *Contra* Doc. 36 at 20. While she casts aspersions on evidence Bishop used a judo move, *id.*, that doesn't move the needle. Bishop submitted an expert opinion that judo tactics are not "contrary to generally accepted practice in law enforcement" and that over the past decade law enforcement officers have begun using judo and other martial arts to deescalate and gain control of volatile situations like the one Carter helped create. Doc. 29-7 at ¶104. Without such evidence, she leaves the Court—and Bishop—to speculate. But speculation does not satisfy her burden to identify clearly established law. The Court grants summary judgment on Count II.

## II.    Count III: Malicious Prosecution

Carter sues Bishop for malicious prosecution, claiming that he falsely accused her of kicking him during the arrest and used that lie to have her charged with second degree assault. Doc. 1 at ¶¶37-40. Carter must prove "both (1) the elements of the common-law tort of malicious prosecution and (2) a violation of h[er] Fourth Amendment right to be free from unreasonable seizures." *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (internal quotation marks omitted) (quoting *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018)). The "elements of the malicious prosecution tort" are "(i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution terminated in the acquittal or discharge of the accused." *Thompson v. Clark*, 596 U.S. 36, 44 (2022) (internal quotation marks omitted). A Fourth Amendment claim requires a plaintiff to prove two more elements: "that the legal process justifying [her] seizure was constitutionally infirm" and "that [her] seizure would not otherwise be justified without legal process." *Butler*, 85 F.4th at 1111-12 (quoting *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir. 2020)).[1]  While "[i]ntentional or reckless material misstatements or omissions

---

[1] Bishop also argues that Carter cannot meet the favorable-termination prong because her charges were dismissed pursuant to an agreement to attend anger management classes, Doc. 32 at 29, but

18

in a warrant affidavit … could violate the Fourth Amendment," merely "[n]egligent misstatements or omissions … do not." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).

The parties dispute whether there was probable cause to arrest Carter for second degree assault, in particular whether Carter kicked Bishop. *See* Doc. 36 at 21. Carter argues that because she denies kicking Bishop, there is a factual dispute that must be resolved by a jury. *Id.* But because Carter claims Bishop "intentionally mispresent[ed] incriminating facts," Doc. 1 at ¶37, she "bears the burden of creating a genuine dispute about whether the officer['s] accusation against h[er] was intentionally false and not, for example, a mistaken belief on the part of the officer[]." *Williams*, 965 F.3d at1165. She cannot carry her burden through general attacks on credibility, conclusory allegations, or speculation. *Id.* at 1165-66. Instead, she must "identify affirmative evidence from which a jury could find" that Bishop lied. *Id.* at 1166 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)).

In *Williams*, the plaintiff carried his burden because the defendants' version of events was so incompatible with the plaintiff's that the "chances" of the defendants being "subjectively mistaken" were "low" and because the defendants' "narrative shifted" after seeing evidence undermining their story. *Id.*

---

the Supreme Court has stated that "a plaintiff need only show that his prosecution ended without a conviction," *Thompson*, 596 U.S. at 39. Carter was not convicted.

19

Here, by contrast, Carter has not submitted any evidence to support the inference that Bishop lied, just evidence that he is mistaken. With Carter, Bishop, and two other officers struggling at such close quarters for almost 30 seconds while Carter (for at least much of that time) was resisting arrest, it is entirely possible that Bishop genuinely but mistakenly believed Carter kicked him. Thus, this is not a case like *Williams* where "the record supports an inference that *someone* is lying," *Williams*, 965 F.3d at 1166, and "general attacks on [Bishop]'s credibility are insufficient to create a genuine issue of fact," *Rahmaan v. McQuilkin*, No. 1:19-CV-02962-SDG, 2022 WL 4773472, at *5 (N.D. Ga. Sept. 30, 2022). Accordingly, based on the record the parties have developed, the assertion that Bishop lied is purely speculative. That is not enough. *Cf. Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001) ("[A] mere scintilla of evidence does not create a jury question"). The Court therefore grants summary judgment on Count III.

## CONCLUSION

The Motion for Summary Judgment (Doc. 31) is **GRANTED**. Judgment will be entered by separate order.

**DONE** and **ORDERED** this 16th day of April, 2026.

_____

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

20